JASON LEE BRIDGES, BY AND THROUGH HIS GUARDIAN, JANE C. BRIDGES, AND JANE C. BRIDGES AND DONALD BRIDGES, INDIVIDUALLY v. SHELBY WOMEN'S CLINIC, P.A. AND HUGH L. FARRIOR, M.D.

No. 8427SC342

(Filed 18 December 1984)

1. **Physicians, Surgeons and Allied Professions § 20.1— negligence—failure to diagnose premature labor—insufficient showing of proximate cause**

In a medical malpractice action to recover damages for the negligent failure to timely diagnose premature labor, the court properly granted defendants' motions for directed verdicts where plaintiffs did not show sufficient causation in that there was insufficient evidence that plaintiff mother would have been given an experimental drug, the only drug then available to suppress labor, had she arrived at Charlotte Memorial Hospital earlier than she did and because there was insufficient evidence that giving the experimental drug would have prevented or lessened the severity of the child's injuries.

2. **Physicians, Surgeons and Allied Professions § 20.1— mental anguish—premature birth—insufficient showing of proximate cause**

The trial court properly entered a directed verdict for defendants on a claim for negligent infliction of mental anguish arising from the premature birth of a child and resulting injuries to the child where plaintiffs failed to show that defendants' negligence was the proximate cause of the child's injuries.

APPEAL by plaintiffs from *Snepp, Judge.* Judgment entered 3 November 1983 in Superior Court, CLEVELAND County. Heard in the Court of Appeals 29 November 1984.

This is a medical malpractice action in which plaintiffs seek to recover damages arising from the defendant doctor's alleged negligence in failing to timely diagnose the plaintiff mother's premature labor and for negligent infliction of mental distress. At

the conclusion of plaintiffs' evidence at trial, the court granted the motions of defendants for directed verdicts pursuant to Rule 50 of the North Carolina Rules of Civil Procedure. From the judgment entered, plaintiffs appealed.

*Erwin and Beddow, by Fenton T. Erwin, Jr., for plaintiff appellants.*

*Kennedy, Covington, Lobdell and Hickman, by Charles V. Tompkins, Jr. and James P. Cooney, III, for defendant appellees.*

HILL, Judge.

Plaintiffs assign as error the trial court's entry of directed verdicts in favor of defendants. In determining the correctness of a directed verdict, we must consider the plaintiff's evidence to be true and resolve all contradictions in his favor, giving him the benefit of every inference which can be drawn from the evidence. *Anderson v. Carter,* 272 N.C. 426, 158 S.E. 2d 607 (1968). "A directed verdict is improper unless it appears as a matter of law that plaintiff cannot recover under any view of the facts which the evidence reasonably tends to establish." *Willoughby v. Wilkins,* 65 N.C. App. 626, 631, 310 S.E. 2d 90, 94 (1983), *disc. rev. denied,* 310 N.C. 631, 315 S.E. 2d 697, 698 (1984).

Plaintiffs' evidence tends to show the following facts, in relevant part: Jane Bridges, the plaintiff mother, became pregnant in January, 1980. During her pregnancy, she received prenatal care from various doctors at the Shelby Women's Clinic (hereinafter "the Clinic") including the defendant Dr. Farrior. In the afternoon of 17 July 1980, Jane Bridges, who was then in her 29th week of pregnancy, noticed that she was spotting. She called the Clinic and spoke with a nurse who told her that the spotting could be old blood and for her to lie down and take it easy but to call back if the blood changed color or if she began to have pain. Mrs. Bridges followed these instructions. That night she began having little twinges of pain in the lower part of her stomach and across her back.

The next morning Mrs. Bridges was still spotting and the blood had changed color. In addition, she experienced pelvic pressure. She called the Clinic and spoke to the same nurse she had spoken to the previous afternoon. The nurse told Mrs.

Bridges that she definitely needed to see a doctor, that Dr. Farrior was on call and would be there at 11:30, and for her to come in to see him then. Mrs. Bridges arrived at the Clinic around 11:30 that morning, was weighed, and gave urine and blood samples. She told the nurse she was experiencing a lot of pressure and was having twinges like pains across her stomach and back, and that the bleeding was getting worse. Mrs. Bridges was told that a physician had diagnosed her symptoms as a kidney infection. She was given a prescription for medication to fight the infection and told to return to the Clinic in a few days. She was not examined or questioned about her symptoms by a physician while at the Clinic on that morning of 18 July 1980.

Mrs. Bridges had the prescription filled and went home to bed. About 3:00 that afternoon, she began to urinate frequently and noticed that her spotting had increased in flow and become redder. Her pelvic pressure and pain had also increased. She called the Clinic about 6:15 p.m. and learned that Dr. Farrior was on call and was at Cleveland Memorial Hospital. She called Dr. Farrior and told him who she was and explained her condition and the preceding events of the day. Dr. Farrior told her that she had a kidney infection, that he could not do anything for her, that it took twenty-four hours for the medicine to get in her bloodstream, and that she was not going to feel any better until it did. When Mrs. Bridges persisted in expressing her concern about her condition, Dr. Farrior told her that if she was going to come to the hospital to see him, she had better not "wait around until midnight or he wouldn't be there, he had had a long day."

Mrs. Bridges and her husband, Donald, arrived at Cleveland Memorial Hospital at 7:15 p.m. Dr. Farrior examined her and told her she was three centimeters dilated and in premature labor. Subsequently he informed Mrs. Bridges that he was going to have her transferred to Charlotte Memorial Hospital where there was a neonatal unit. A neonatal unit specializes in caring for premature children.

Mrs. Bridges was transported by ambulance to Charlotte Memorial Hospital and arrived there about 10:00 p.m. Upon her arrival, she was found to be five centimeters dilated and was diagnosed as being in premature labor. Testimony at trial showed that in normal labor the expectant mother's cervix dilates, or

opens, to about ten centimeters whereas with a premature birth the cervix might only open to seven or eight centimeters. In addition, Mrs. Bridges had an elevated white blood count as had been revealed by the urinalysis taken at the Clinic that morning and a slight fever of 100.4°. The physician noted these signs of infection as well as the earlier diagnosis of a urinary tract infection.

In July 1980, there were no approved drugs for the suppression of labor. However, Charlotte Memorial Hospital was in the process of investigating the effectiveness of an experimental labor suppressant drug, Terbutaline. Dr. John Hisley, who was in charge of the Terbutaline experiment at Charlotte Memorial Hospital, testified that in order to qualify for the experiment women in preterm labor had to meet certain guidelines, called a protocol. They had to be between 27 and 34 weeks pregnant, have no unexplained vaginal or uterine bleeding, and could not be suffering from an unexplained infection or chorioamnionitis. Apparently, Mrs. Bridges was considered for the protocol but because of her advanced dilation and her elevated temperature, she did not qualify for it.

Shortly after July 1980, Charlotte Memorial Hospital ended the Terbutaline experiment. The results of the hospital's experiment were never tabulated because an insufficient number of women had qualified for the experiment. Terbutaline has not been approved by the Food and Drug Administration for use in the suppression of labor. Plaintiffs' expert witness, Dr. Harlan Giles, Professor and Associate Chairman of the Department of Obstetrics and Gynecology at the Texas Tech University School of Medicine, testified that in his experience, Terbutaline was effective in suppressing labor 70% to 80% of the time when it was used. Dr. Hisley testified that, in his experience, only 20% of women in preterm labor were even eligible for use of the drug, and that in those women on whom the drug was used, it was effective about half the time. Dr. Hisley further testified that Terbutaline almost always had side effects, that some of these were serious and some even fatal, and that it could not be predicted in advance whether a particular patient would be able to tolerate the side effects.

No attempt to suppress Mrs. Bridges' labor was made. She gave birth to Jason at 1:53 a.m. on 19 July 1980. Jason was born

about ten weeks premature. He was immediately rushed to the neonatal intensive care unit and placed on a respirator. On 21 July 1980, Jason experienced an intercranial hemorrhage, or bleeding in his brain. Subsequently his condition improved somewhat, however, on 28 July, he suffered another and much more severe intercranial hemorrhage. The evidence tended to show that Jason's premature birth precipitated the intercranial hemorrhaging and that the hemorrhaging caused the impairments which Jason has. Jason is profoundly mentally retarded and has cerebral palsy, hydrocephalus, epilepsy, and scoliosis. The evidence further showed that the severity of the intercranial hemorrhaging correlated directly with the severity of Jason's mental retardation and cerebral palsy.

[1] Plaintiffs first contend the trial court erred in directing a verdict in favor of defendants on their claim based upon the negligence of Dr. Farrior. Plaintiffs alleged that Dr. Farrior was negligent in failing to examine Mrs. Bridges at her 11:30 a.m. appointment at the Clinic on 18 July 1980 to see if she was in premature labor, and that Dr. Farrior's negligence was a proximate cause of Jason's impairments. In order to withstand the defendants' motion for a directed verdict on their negligence claim, plaintiffs were required to offer evidence establishing the following: (1) the standard of care; (2) breach of the standard of care; (3) proximate causation; and (4) damages. *Lowery v. Newton*, 52 N.C. App. 234, 237, 278 S.E. 2d 566, 570 (1981). If plaintiffs failed to present sufficient evidence of any one of these elements, the defendants were entitled to directed verdicts. *Id.*

Defendants concede in their brief that plaintiffs' evidence, when viewed in the light most favorable to plaintiffs, was sufficient to establish the standard of care, breach of the standard of care, and damages. However, defendants contend plaintiffs' evidence was wholly insufficient to establish the requisite causal connection between Dr. Farrior's negligence and Jason's impairments. Plaintiffs, on the other hand, argue that they presented sufficient evidence to establish proximate cause in that the jury could have found from the evidence the following chain of causation: that had Dr. Farrior examined Mrs. Bridges at 11:30 a.m. on 18 July 1980, he would have, or should have in the exercise of reasonable care, diagnosed her as being in premature labor; that given such diagnosis, Mrs. Bridges would have been sent to Char-

lotte Memorial Hospital at an earlier time; that had she arrived at Charlotte Memorial Hospital at an earlier time, she would have been eligible for the Terbutaline experiment; that had she been given Terbutaline, she would have been able to tolerate the drug and would not have suffered side effects which would have required discontinuance of usage of the drug; that the drug would have suppressed Mrs. Bridges' labor thereby delaying Jason's birth; and that a delay in Jason's birth could have altered his condition.

After carefully examining the record, we conclude that the chain of causation relied upon by plaintiffs is not sufficient to support their claim because the evidence is not sufficient to establish at least one of its crucial links—that had Mrs. Bridges arrived at Charlotte Memorial Hospital sooner than she did on 18 July 1980, she would have been given the experimental drug Terbutaline. Dr. Hisley, who testified about Charlotte Memorial Hospital's requirements for the use of Terbutaline, stated that in order for a woman in labor to qualify for use of Terbutaline, she could not have any unexplained vaginal or uterine bleeding, and could not be suffering from any unexplained infection. The evidence presented tended to show that Mrs. Bridges had both an unexplained infection, as indicated by her temperature and elevated white blood count, and unexplained bleeding on 18 July 1980; therefore, she would not have qualified for the use of Terbutaline even if she had arrived at the hospital earlier in the day. Based on such evidence, the jury could not have reasonably concluded that Mrs. Bridges would have been given the drug if she had arrived at the hospital at an earlier time.

Moreover, we do not believe plaintiffs presented sufficient evidence to show that it was reasonably probable that had Mrs. Bridges been given Terbutaline, that it would have prevented or lessened the severity of Jason's injuries. Jason's treating physician, Dr. Docia Hickey, testified that in her opinion the main cause of intercranial hemorrhaging was prematurity, and that the risk of intercranial hemorrhaging continues in infants through the 35th week of gestation. She indicated that it is not until after the 34th or 35th week of gestation that there is no longer the substantial possibility of an intercranial bleed.

The evidence showed that Jason's gestational age at birth was approximately 30 weeks old. Therefore, there would still have been a substantial possibility that Jason would have suffered an intercranial hemorrhage unless his birth was delayed by at least four or five weeks. Dr. Hickey indicated that there was only a slight possibility that if Jason's birth had been delayed by one week that the delay would have reduced the risk that Jason would have an intercranial hemorrhage.

Dr. Hisley, of Charlotte Memorial Hospital, was the only witness to testify about the length of time Terbutaline would suppress labor, if the drug was effective and was tolerated by the patient. He stated that based on the literature available prior to July 1980, his opinion was that the length of time labor was suppressed when Terbutaline was used was anywhere from twenty-four hours to six or seven weeks, and that the average length of time was three weeks. Other studies, however, disputed those figures which was why Charlotte Memorial Hospital was conducting it own investigation of the drug.

Dr. Hisley's testimony as to the duration of Terbutaline's effectiveness was inconclusive and conjectural. At best, the evidence may have been sufficient to permit the jury to conclude that there was a possibility that the drug, if effective, may have suppressed labor for 4 or 5 weeks, the period of time necessary to substantially reduce the risk that Jason would have an intercranial hemorrhage. The evidence did not show that this was reasonably probable, or that it was probable that Mrs. Bridges could have even tolerated the drug as was required. *See Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E. 2d 541 (1964). As stated by our Supreme Court in *Phelps v. Winston-Salem*, 272 N.C. 24, 30, 157 S.E. 2d 719, 723 (1967):

> The law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible. . . . If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause.

We conclude that plaintiffs failed to present sufficient evidence from which the jury could have reasonably found the ex-

istence of the necessary causal connection between Dr. Farrior's delay in examining Mrs. Bridges and Jason's injuries. Accordingly, we hold that the directed verdict against plaintiffs on their negligence claim was proper.

[2]  Plaintiffs next contend the trial court erred in directing a verdict in favor of defendants on Mrs. Bridges' claim for negligent infliction of mental anguish. It is clear that the mental anguish for which Mrs. Bridges seeks recovery centers completely on the injuries sustained by her son. Since plaintiffs failed to show that Dr. Farrior's negligence was a proximate cause of Jason's injuries, it follows *a fortiori* that plaintiffs failed to show that Dr. Farrior's negligence was a proximate cause of the mental anguish of Mrs. Bridges resulting from Jason's injuries. We hold the trial court's entry of a directed verdict in favor of defendants on Mrs. Bridges' claim for negligent infliction of mental anguish was proper.

Affirmed.

Judges HEDRICK and WEBB concur.