IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 16, 2003 Session

## JUANITA W. KEYLON v. ROBERT A. HILL

Appeal from the Circuit Court for Roane County
No. 12413      Russell E. Simmons, Jr, Judge

FILED DECEMBER 11, 2003

No. E2003-01054-COA-R3-CV

---

The plaintiff's motion for partial summary judgment, based upon the asserted failure of the defendant to countervail the motion, was denied by the trial judge. The plaintiff argues that the established rule that the denial of a motion for summary judgment, followed by a jury trial and verdict, is not reviewable, has no application in this case because there was no verdict. The rule is that the denial of a motion for summary judgment is not reviewable when the case proceeds to judgment, as distinguished from verdict. The motion of the defendant in this medical malpractice case for a directed verdict made at the close of all the evidence was granted upon a determination that all of the expert testimony established that the three-hour window to administer a blood clot dissolver had expired before the defendant treated the plaintiff. Whether the particular anticoagulant should have been administered in a timely manner was at the core of the claimed negligence. We find the question of negligence to be within the peculiar province of the jury, and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Reversed in Part and Remanded**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

Elizabeth K. Johnson and Donald K. Vowell, attorneys for appellant, Juanita W. Keylon.

Heidi A. Barcus and James Harry London, Knoxville, Tennessee, attorneys for appellee, Robert A. Hill.

## OPINION
### I.

This is a medical malpractice case. The motion of the Plaintiff for partial summary judgment was denied, and the case was thereupon scheduled for trial, on January 8, 2003. At the conclusion of all the proof, Dr. Hill moved for a directed verdict which was granted. The motion of the Plaintiff

for a new trial was denied. She appeals and presents for review two issues: (1) whether her motion for partial summary judgment should have been granted, and (2) whether the motion of the Defendant for a directed verdict was properly granted.

## II.

The Plaintiff alleged that: on December 26, 2001, she was taken to the Roane Medical Center emergency room for medical treatment, where her condition was diagnosed as acute; Dr. Robert A. Hill was the emergency room physician on duty; she complained of symptoms "that are plain and obvious signs of a stroke," which appeared suddenly and immediately preceding her arrival at the emergency room; she was in fact having a stroke, which Dr. Hill failed to diagnose and treat accordingly; Dr. Hill diagnosed her as having Pain OS [oculus sinister] and then discharged her with instructions to seek further treatment "later today at Roane Eye Center"; she went to Roane Eye Center and was seen by an optometrist who thought she was suffering from a stroke "right now"; she immediately was taken to Parkwest Medical Center where she was diagnosed with an "occipital lobe stroke" and treated accordingly; a stroke requires immediate care, and Dr. Hill was negligent and violated the applicable standard of care because:

He failed to conduct an appropriate medical examination of Mrs. Keylon.

He failed to use diagnostic tools and information available to determine Mrs. Keylon's condition.

He failed to promptly and properly diagnose Mrs. Keylon's medical problem.

He failed to promptly recognize and properly respond to signs and symptoms of Mrs. Keylon's condition.

He failed to properly document the course of Mrs. Keylon's condition and treatment.

He failed to realize that Mrs. Keylon was experiencing a stroke.

He failed to treat Mrs. Keylon for stroke.

He failed to stabilize Mrs. Keylon's condition before releasing her.

He failed to consult with a physician or other qualified health care provider possessing the training, experience and skill necessary to promptly and properly diagnose and treat Mrs. Keylon's condition.

He failed to consult a neurologist.

He failed to transfer Mrs. Keylon to another medical facility equipped to provide care and treatment for a stroke patient.

The plaintiff further alleged that as the proximate result of Dr. Hill's negligence and deviations from the applicable standard of care, considerable time elapsed between the onset of symptoms and treatment, causing Mrs. Keylon to suffer injuries that would not otherwise have occurred, including but not limited to the following: loss of vision, loss of coordination, loss of strength, loss of limb movement, loss of balance, loss of reaction time, loss of concentration, loss of speed of thought, loss of memory, loss of awareness of space (where objects are in relation to each other), general depression, costs of medical care, costs of rehabilitation services, costs of long-term and custodial care, loss of services and loss of enjoyment of life, and as the proximate result of Dr. Hill's negligence and deviations from the applicable standard of care, Mrs. Keylon can no longer do certain activities that she would have been able to do otherwise, including but not limited to the following: place a telephone call, read a book or newspaper, take a walk, drive a car, wash dishes, cook, watch TV, play cards, write a letter, do laundry, and vacuum.

### III.

Dr. Hill answered the complaint *in seriatim* denying all allegations of negligence, and "demanding strict proof thereof."[1]  He averred further and averred without admitting liability that the matters complained of resulted from one or more independent causes or phenomena, and did not result from any act or omission that constituted any negligence or malpractice, and that he is not liable for any injury or damage for which the Plaintiff seeks recovery because any injury or damage was caused by unavoidable accident.

Dr. Hill further averred that in examining and otherwise caring for Mrs. Keylon, he acted in accordance with that degree of skill, learning and experience ordinarily used, possessed and practiced by physicians in similar circumstances in Roane County and similar communities; that accepted and proper methods were used in examining and otherwise caring for Mrs. Keylon; and that in examining and otherwise caring for Mrs. Keylon, he acted in accordance with the reasonable requirements of good medical care and practice and in accordance with the applicable standard of care.

### IV.
#### The Motion for Partial Summary Judgment

The Plaintiff filed a motion for partial summary judgment as to liability - and supported it with evidentiary materials.  Dr. Hill responded with his affidavit, deposing that he was familiar with the applicable standard of care and that he did not violate such standard because he concluded that the plaintiff's symptoms were more consistent with an ocular problem than a stroke.  The motion

---

[1] We find nothing in the Rules of Civil Procedure which, even by inference, provides that an allegation may be denied while concurrently demanding "strict proof thereof."  Presumably this anomaly is a remnant of equity practice no longer viable.

was denied, and the case proceeded to trial resulting in a directed verdict for the Defendant, as aforesaid.

The denial of her motion is an issue presented for review by the Plaintiff, who argues that Dr. Hill's response, as supported, created no issues of material fact and that she was entitled to judgment as a matter of law.

The well-known rule that the denial of a motion for summary judgment predicated upon the existence of a genuine issue of material fact is not reviewable on appeal when a judgment is subsequently rendered after a trial on the merits, has no application to the case at Bar, according to the Plaintiff, who argues that the rule is applicable only when the denial is followed by a *jury verdict*. [Emphasis added]. The rule attached when a *judgment* is subsequently rendered - not necessarily a *verdict* - the words are not interchangable. A *judgment* was rendered against Mrs. Keylon, and the denial of her motion for summary judgment cannot be reviewed. *See*, **Purkey v. Purkey**, 1998 WL 334406, 2 (Tenn. Ct. App.)

### Standard of Review

When reviewing a trial court's disposition of a motion for directed verdict, appellate courts do not resolve disputes in the evidence, weigh the evidence, or evaluate the credibility of the witnesses. Instead, we review the evidence most favorably to the party against whom the motion is made, give that party the benefit of all reasonable inferences from the evidence, and disregard all evidence contrary to that party's position.

Directed verdicts are appropriate only when reasonable minds can reach but one conclusion. A case should go to the jury, even if the facts are undisputed, when reasonable persons could draw conflicting conclusions from the facts.

**Richardson v. Miller**, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000).

### VI.
### The Directed Verdict

The trial judge, in directing a verdict for Dr. Hill at the conclusion of all the proof, stated:

The one fact all of the witnesses agreed on was that the drug could not be administered three hours after onset of stroke symptoms. . . . From the evidence presented by the parties, the only conclusion a reasonable mind could draw is that the timing for the onset of stroke symptoms begins at the last time the persons can reasonably say the stroke patient was all right. The only evidence of this was that the patient was all right when she went to bed at 11:00. The window of time to administer the drug would have been over at 2:00 a.m.

-4-

> Based on this conclusion, the only conclusion reasonable minds could draw would be that the defendant did not breach the standard of care of administering the drug when the administering of the drug could only have been within a three-hour period that ended at 2:00 and the plaintiff was not a candidate for the use of the drug TPA [sic]. Based on this, the Court must direct a verdict for the defendant.

Substantial proof was presented by the Plaintiff that, while in the emergency room at Roane Medical Center, she complained of blurred vision, inability to focus, double vision, significant pain, and pain on the left side of head. She related her medical history, old age (79), high blood pressure, smoking, and heart disease. Her condition was classified as acute. Following some tests including a CT scan, Dr. Hill made the diagnosis of Pain OS (left eye), discharged her at 6:45 a.m. with instructions to go to the Roane Eye Center, where an Optometrist quickly diagnosed her as having a stroke "right now," and referred her to Parkwest Hospital Emergency Room, ten miles distant, where she saw Dr. Van Helms, an ER physician. Her complaints were "problems walking, visual disturbance, disturbance to thought process, *onset 3:30. No change since onset*." His diagnosis was "left occipital CVA," [cardiovascular accident, or stroke]. His treatment consisted of prescribing Heparin, (an anticoagulant), other tests, including a CT scan which revealed a left occipital infarct, or stroke. Mrs. Keylon was referred to a neurologist, Dr. Jack Scariano, who admitted her to the hospital for treatment of an occipital lobe stroke.

### The Issue of Negligence

Dr. Jack Scariano is a board-certified neurologist who practices at Parkwest Hospital in Knoxville. He testified that Mrs. Keylon arrived at the Roane Medical Center Emergency Room at 4:35 a.m.; that someone [at Roane Medical Center] wrote "on there" that she "can't see out of her eyes," which was a symptom of a stroke; that she arrived in a wheelchair; that she had a past medical history of cardiovascular illness, a risk factor for a stroke; that she was complaining of pain on the left side of her head, also a symptom of a stroke; that she was unable to focus, another stroke symptom; that she was hypertensive, also a risk fact; that the CAT scan taken at the Roane Medical Center generally does not show stroke within the first eight to twelve hours (following a stroke) and the CAT scan was normal, which did not rule out the occurrence of a stroke, but "it does rule out that you've had a bleed," but "there were no signs of her having an actual bleed."

He testified further that with a normal CAT scan it was proper to use anticoagulation treatment; that "the only anticoagulation treatment approved now to actually treat stroke would be TPA "which is a drug that breaks up blood clots"and restores blood flow to the affected area resulting in significant neurological improvement in most instances.

When asked to explain the timing of administering the drug, he testified that it must be given within three hours of when the patient notices the symptoms, and because of a mistaken diagnosis Mrs. Keylon was not given the drug, and she was discharged from the ER at 6:45 a.m. She arrived at Parkwest Hospital at 12:40 [p.m.] too late "to give TPA."

She was seen and treated by Dr. Helms at the Parkwest Hospital, who ordered a CAT scan which confirmed that she had suffered a stroke. The medical record at Parkwest established the *onset of symptoms at 3:30 a.m.*

Dr. Scariano testified that within a reasonable degree of medical certainty he had an opinion that Dr. Hill deviated from the standard of care in his treatment of Mrs. Keylon. Specifically, he testified:

> A.      I do feel that he – that he didn't recognize that a sudden visual loss is a sign of an acute stroke, he also diagnosed visual loss due to acute glaucoma even though the intraocular pressures were normal.
>
> Q.      What about the treatment that Dr. Hill gave to Ms. Keylon? Did – in your opinion did he violate the standard of care in the treatment?
>
> A.      Without making that actual proper diagnosis, he couldn't consider the actual treatment. There was a treatment available, with reasonable medical probability, could have improved her outcome.
>
> Q.      And what was that treatment?
>
> A.      TPA.
>
> Q.      And did – do you find that Dr. Hill violated the standard of care with regard to whether he referred Ms. Keylon to a specialist or to any other institution?
>
> A.      I know that actually Roane County sends us patients here at Parkwest all the time. So we were certainly available to get the actual patient, you know, sent to us. And we eventually got her anyway, so – and I'm sure he knows that that's an option, because I see it all of the time. So, if he wasn't sure, he certainly could have called us.
>
> Q.      All right. And would you have been the doctor on call had he called?
>
> A.      Probably, yes.

Q.    Now, if Dr. Hill had followed the standard of care, Dr. Scariano, do you have an opinion, within a reasonable degree of medical certainty, as to whether it would have made a difference for Ms. Keylon?

A.    Well, with reasonable medical probability, we know that giving TPA can improve stroke outcomes. That's why it's been approved by the FDA to actually give to people who have strokes.
So, yes, if she would have gotten TPA within the appropriate time frame for this type of actual stroke, with reasonable medical probability, she could have had a better outcome.

Q.    All right. Dr. Scariano, you said could have and that she can improve, and I want to ask you to talk about that some more specifically with regard to the probability that she would improve.

A.    I've already testified that at the institution here we see that approximately 70 percent of the patients who have strokes and get TPA and who are candidates to get TPA and get it do significantly or totally improve.

Q.    And would that hold true for Mrs. Keylon? Would it have held true for Mrs. Keylon in this case?

A.    Yes. If she – would have gotten here within the appropriate time frame, we could have actually given her that and she would have that probability of having actually a better outcome.

As ground for the motion for a directed verdict, Dr. Hill alleged that

(1) the Plaintiff has failed to prove by expert testimony the recognized standard of acceptable professional practice applicable to emergency physicians practicing in Roane County or in a similar community; (2) the Plaintiff has failed to prove by expert testimony that the Defendant Dr. Hill failed to meet that recognized standard; (3) the Plaintiff has failed to prove by expert testimony that as a proximate result of Dr. Hill's negligence, the Plaintiff suffered injuries that would not otherwise have occurred; and (4) the Plaintiff has failed to produce any evidence of damages.

As heretofore stated the motion for a directed verdict was granted because

> . . . The only conclusion a reasonable mind could draw is that the timing for the onset of symptoms begins at the last time the person can conclusively say the stroke patient was all right. The only evidence of this was that the patient was all right when she went to bed at 11:00. The window of time to administer the drug would have been over at 2:00 a.m.. . . . the defendant did not breach the standard of care of administering the drug when the administering of the drug could only have been within a three-hour period that ended at 2:00 and the plaintiff was not a candidate for the use of the drug TPA . . .

Tennessee Code Annotated § 29-26-115(a)(1) provides:

> – (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act of omission, the plaintiff suffered injuries which would not otherwise have occurred.
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

A directed verdict is appropriate where "the evidence is susceptible to but one conclusion." *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). In considering a motion for directed

verdict, the Court must take the strongest legitimate view of the evidence presented by the plaintiff and must draw all reasonable inferences in favor of that party. ***Eaton v. McLain***, 891 S.W.2d 587, 590 (Tenn. 1994); ***Long v. Mattingly***, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990). A grant of a directed verdict is warranted where the Court concludes that reasonable minds could not differ as to the conclusions drawn from the evidence presented. *See **Alexander***, 24 S.W.3d at 271.

With respect, we have determined that the trial judge misapprehended the testimony of Dr. Scariano, which we have reproduced. The ruling of the trial judge was that ". . . the patient was all right when she went to bed at 11:00. The window of time to administer the drug would have been over at 2:00 a.m." This time period – 11:00 a.m. to 2:00 a.m. – is irrelevant under the proof. Mrs. Keylon had apparently not yet suffered a stroke. There is abundant evidence that *she was under the care of the defendant during most of the so-called window of time* to administer the clot-dissolving drug. Whether he was negligent in his treatment of the Plaintiff was a question for the jury to determine, and the motion for a directed verdict was inappropriately granted.

## Qualification of Expert Witness

The defendant presents for review the issue of whether a directed verdict is appropriate "where the [Plaintiff] failed to establish any of the elements required to support a claim under the Tennessee Medical Malpractice Act."

In a general way, much of the foregoing opinion addresses this issue; what is not addressed is the issue not specifically asserted, but intended: whether Dr. Scariano, on whose testimony we have focused, was qualified to testify as an expert witness. The trial judge held that he was qualified, and we agree.

At the outset, we note that the Appellee's brief takes undue liberties with the art of advocacy by the mischaracterization of testimony and the non-contextual recital of selected segments. The difficulties attendant upon such practices are self-evident and the practice is never productive.

The defendant argues that Dr. Scariano testified that his opinion as to the applicable standard of care was based on a national standard, not recognized in this jurisdiction. Dr. Scariano *practiced in Roane County* for a few years, and then relocated ten (10) miles away, in Knox County.

We reproduce his qualifying testimony:

> . . . I commonly treat patients for stroke. I commonly receive referrals of stroke patients from primary care doctors, hospitals and emergency rooms located throughout the East Tennessee community, including Knox County, Roane County, Cocke Count Cumberland County, Hamblen County, Loudon County, McMinn County, Monroe County and Sevier County. Stroke is a common medical condition that is treated by primary care doctors, hospitals and emergency rooms in

East Tennessee on a regular basis. Roane, Cocke, Cumberland, Hamblen, Loudon, McMinn, Monroe, and Sevier counties are all geographically close to Knox County, all lying within 25 miles of Knox County. Roane County is contiguous to Knox County and is approximately ten miles away from the Fort Sanders Parkwest Medical Center. These counties generally have only one hospital and one emergency room, although there are two hospitals in Hamblen County and McMinn County. Populations in these counties are less than Knox County, and the hospitals are smaller and there are fewer specialists. Most hospitals in these counties, including Roane Medical Center, have MRI and CT scanning equipment. ER doctors in these hospitals commonly treat stroke patients with thrombolytics. None of these hospitals are teaching hospitals; none have medical schools. I commonly examine treatment records of stroke patients referred from these counties, and I commonly have contact with primary care doctors, hospitals and emergency rooms from these counties, including discussions of the patient's medical history and treatment received in those counties. I commonly send recommendations for treatment back to the referring physicians in the patient's home area. My contact with primary care doctors, hospitals and emergency rooms in these counties has made me familiar with the standard of care for recognizing stroke in each of these counties, including Roane County. The standard of care for recognizing stroke in each of the counties is the same. All doctors in these counties who see patients on an initial basis, including primary care doctors and emergency room doctors, must be able to recognize stroke, and are governed by this standard of care.[2]

We affirm the judgment denying the plaintiff's motion for a partial summary judgment: we reverse the judgment granting the defendant's motion for a directed verdict, and remand the case to the trial court for a new trial. Costs are assessed to the Appellee.

_____
WILLIAM H. INMAN, SENIOR JUDGE

---

[2] It is of interest, perhaps of significance, that the *optometrist* at Roane Eye Center, who was not a medical doctor, immediately recognized that Mrs. Keylon had a stroke *"right now."*